Michael J. San Souci
LAW OFFICE OF
MICHAEL J. SAN SOUCI
2135 Charlotte St., Suite 1A
Bozeman, MT  59718-2741
Telephone No.: (406) 586-2221
Fax No.:          (406) 582-1966
E-Mail:           mjsansouci@aol.com

Attorney for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### (Billings Division)

| | |
|---|---|
| PAUL CARAWAY, | Cause No. CV-16-139-BLG-TJC |
| Plaintiff, | **PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTIONS IN LIMINE** |
| vs. | |
| TOWN OF COLUMBUS, GARY WOLTERMANN and WILLIAM PRONOVOST, individually and as agents. | |
| Defendants. | |
| _____/ | |

## I.  RECAPITULATION

    ***A. The Court Should Bar or Substantially Limit Evidence, Testimony, Reference or Argument Related to Matters Other Than the Specified Reasons in the Pre-Termination and Termination Letters.***

As alluded to in Caraway's moving papers, the pre-termination letter signed by Defendant Woltermann, and presented to him by Defendant Pronovost, advised

him that he was suspended, without pay, and that Columbus intended to terminate his employment based on certain incidents of alleged misconduct against him which, not at all coincidentally, sidestepped the initial allegation of "sexual assault" that had given rise to his suspension and the DCI investigation at the outset. Importantly, Pronovost conceded that the credibility of Caraway's accuser certainly was in question prior to that time.  In their response to Caraway's exclusionary motion the defendants acknowledge:

> "All claims have their origin in a July 2015 allegation of sexual assault against Plaintiff.  The allegation resulted in plaintiff's suspension from work and an independent six-week investigation conducted by Montana's Department of Criminal Investigation. ... The day after the criminal investigation concluded, the City began its own investigation into Plaintiff's misconduct by interviewing him on a wide-range of topics concerning his employment.  This interview and the City's investigation necessarily included topics which had arisen during the criminal investigation." (See Doc. No. 49; Defs' Resp. Br., p. 3)[1]

While conceding that Caraway's initial suspension, and ensuing termination, admittedly had their genesis in the discredited allegation of sexual assault, the defendants chose, instead, to rely on seven other accusations essentially cherry-picked from the expansive DCI investigative file, as reflected in the November 6, 2015 and November 20, 2015 letters signed by Defendant Woltermann.  Obviously,

---

[1] The DCI investigation actually consumed the better part of sixteen (as opposed to six) weeks.

these were comprised of certain alleged incidents or events the City felt might be easier to defend or justify as additional reasons to warrant the impending termination of Caraway's employment – with the validity of the sexual assault claim squarely having been called into question in the process.  Thus, having focused and relied on these reasons to essentially build a case and thereby facilitate Caraway's termination, the defendants now object to Caraway's request that any corresponding evidence be limited accordingly.  This appears to be further acknowledged in the defendants' response; to wit:

> "The City's investigation culminated in its November 6, 2015 pre-termination and November 20, 2015 termination letters.  These letters set forth the reasons for Plaintiff's termination. ... This general set of facts is relevant to all claims and must be presented to the jury.  While the full content of the criminal investigation is not necessarily central to those facts, issues raised in the criminal investigation naturally spilled over into the City's employment investigation and ultimately the termination letters.  In other words, some information 'gleaned' from the criminal investigation was presented to Caraway during his employment investigation interview, became part of his employment investigation and ended up in the termination letters." (See Defs' Resp. Br., p. 4)

It is unsurprising that, with the exception of their potential use as an admission against interest or for impeachment purposes, courts generally exclude evidence bearing on the results, conclusions or recommendations of internal investigations or investigative bodies, holding that the potential for prejudice

substantially outweighs any potential probative value.  See, for example, <u>Bruce v. City of Chicago</u>, 2011 WL 3471074, at *6 (N.D. Ill. 2011) (finding that the jury should not hear evidence regarding an investigation undertaken by the Independent Police Review Authority (IPRA) concerning the incidents at issue; the reasons for the investigation, or the IPRA's recommendations).  As the main reason offered to support their termination decision, the defendants in the present case admittedly seized upon the conclusion drawn by a member of the Attorney General's Office, following the underlying DCI investigation, that Caraway's credibility had been called into question – despite the agency's decision not to prosecute and the serious credibility issues that had been raised about his accuser. (<u>See</u> Doc. No. 33-2; Br. re Motion to Amend, pp. 13-15)$^2$  Apart from the inherent potential for prejudice engendered by the DCI investigative file, compounding matters is the general "credibility" determination of the Attorney General's Office, which makes absolutely no mention of, or reference to, the sources of these concerns.

---

$^2$ Another reason drawn from the DCI investigation, and included in the suspension and pre-termination letters as a justification for Caraway's impending discharge, pertains to an accusation that he had met with a woman, identified as "KJ," in a local park.  A statement contained in the subsequently obtained DCI file indicates that this information was elicited from a camp host volunteer, who claims to have seen Caraway seated across a picnic table from KJ, and talking, on several occasions.  He acknowledged, however, that they were simply "sitting there visiting" and he never witnessed anything inappropriate.  Both Caraway and KJ have described their relationship as that of longtime family friends, and she characterizes Caraway as someone in whom she and her husband can confide.

Consequently, Caraway faces the task of essentially tilting at windmills in this regard.

For the most part, however, the defendants seem to be in agreement with Caraway's request that any corresponding evidence be both germane and limited to the reasons set forth in the pre-termination and termination letters, arguing that "[t]he reasons set forth in the City's termination letters provided more than good cause for terminating Plaintiff's employment." (See Defs' Resp. Br., p. 5) According to the defendants, the presentation of those issues would "require the admission of additional evidence outside the letters themselves to help the jury understand the context of the charge and why it was severe enough to merit termination" from the City's perspective. Id.  As Caraway's in limine motion requests in relevant part:

> "Caraway moves to preclude the defendants from offering evidence
> or argument at trial bearing on any issues other than the stated
> reasons, set forth in the November 6, 2015 and November 20, 2015
> pre-termination and termination letters, including a corresponding
> limitation on the contents of the recently disclosed ... [DCI] file."
> (See Doc. 44; Pltf's Br. re Motions in Limine, p. 2)

Therefore, for all intents and purposes, the parties generally seem to concur on this issue which, in turn, is aptly supported by the applicable law in <u>Barnett v. Holcim</u>, <u>Galbreath v. Golden Sunlight Mines</u> and similar cases cited by Caraway.

(See Pltf's Br. re Motions in Limine, pp. 4-5)[3]  Therefore, the defendants' suggestion that Caraway may be seeking "a complete bar on evidence outside the termination letters" is inaccurate.  Ironically, the cases cited by the defendants are not to the contrary and would, if at all, stand in support of Caraway's position.

　　　　In re Homestore.com, Inc., 2011 WL 291176 (C.D. Cal. 2011), arose under very different facts and circumstances (i.e., a protracted securities litigation spanning more than 14 years), and addressed ten in limine motions brought by the plaintiff, and seventeen brought by the defendant.  The referenced segment of the court's order addressed an in limine motion brought by the defendant to exclude testimony from, and evidence related to, parallel criminal and SEC proceedings, including judgments and assertions of Fifth Amendment privileges.  In denying this motion (and in its reliance on Lopez v. Chula Vista Police Dept. 2010 WL 6850154 (S.D. Cal. 2010)), the court did so insofar as it sought to exclude "any and all evidence or reference to these proceedings, including the complaints, indictments, and other evidence," as having been overly broad.  It bears mentioning, however, that in another segment of its order the court in Homestore granted the defendant's motion in limine seeking to exclude an underlying audit committee investigation

---

[3] As the defendants correctly observe, this issue would be affected, and largely mooted, depending on the Court's forthcoming ruling on Caraway's pending motion to amend.

report which, it noted, contained "a compilation of documents, including memorandum describing interviews of ... employees, summaries of Homestore's transactions, and other documents ... and statements that constitute hearsay."

### B. The Court Should Bar or Substantially Limit Evidence, Testimony, Reference or Argument Related to Income Sources Collateral to Caraway's Lost Earnings and Benefits with the Columbus PD.

While the defendants appear to have conceded the inadmissibility, under the collateral source rule, of any evidence pertaining to Caraway's receipt of unemployment benefits, they offer an interesting end-run argument concerning his receipt of a retirement pension from his previous tenure with the Stillwater County Sheriff's Office, as well as his wife's receipt of disability benefits from her previous employment with the Tucson Police Department.  According to the defendants, this should properly be framed as "a question of fact relevant to when Caraway may have intended to retire." (See Defs' Resp. Br., p. 6)  Further, according to the defendants – and based on nothing more than Caraway's previous suggestion that he had, at various times, considered retirement – "the jury should be allowed to hear evidence concerning his household's existing retirement income which makes it less likely he would have worked through age 62." (Id.)  However, even in the segment of his deposition testimony referenced by the defendants Caraway qualified his answer, concluding that he intended to defer retirement until age 62.  Moreover, this

decision undoubtedly would have been galvanized by Caraway having succeeded Pronovost as Police Chief, as had been contemplated prior to the accusation in question.

As set forth in Caraway's moving papers, pension or retirement benefits generally are considered a collateral source for which there should be no offset or reduction. (See Pltf's Br. re Motions in Limine, p. 7)  For that matter, any evidence or argument that his spouse may receive disability retirement income from her previous employment would clearly be irrelevant and highly prejudicial since Caraway's alleged damages for lost earnings and related benefits pertain, if at all, solely to the loss of his employment with the Columbus Police Department.  Much like the inadmissibility of a plaintiff's receipt of unemployment benefits or retirement benefits from a collateral source, it is well established that evidence of a plaintiff's receipt of disability benefits is likewise inadmissible.  See, e.g., _Hamlin v. Charter Twnshp. of Flint_, 165 F. 3d 426, 432-33 (6th Cir. 1999); _Arenson v. Callahan_, 128 F. 3d 1243, 1247-48 (8th Cir. 1997) (same).  Consequently, any disability benefits received by a plaintiff cannot be offset, let alone those of his spouse.

When presented with arguments analogous to those advocated by the defendants, it appears that a majority of circuit and district courts nevertheless have

precluded the admission of evidence going to collateral benefits and, even if deemed potentially relevant for another purpose, any probative value would be substantially outweighed by the prejudice that inevitably would result.

Although arising in a different context, the district court in <u>Lee v. Consolidated Rail Corp.,</u> 1995 WL 734108, *3 (E.D. Pa. 1995), essentially held that a court is not permitted to balance the prejudicial effect against the probative value, pursuant to Rule 403, because the receipt of pension benefits generally is considered prejudicial as a matter of law.  In <u>Lee</u>, the defendant filed a motion for a new trial after judgment was entered against it on the grounds that evidence of the plaintiff's railroad retirement benefits was excluded.  Similar to the argument being advanced by the defendants in the present case, Consolidated Rail argued that the evidence was admissible because it would tend to show that the plaintiff had an incentive to retire early at age 62 instead of working until 65, and this evidence theoretically was crucial because the calculation of lost earnings depended on the length of time that the plaintiff intended to work. <u>Id</u>. at *4.  Also see, <u>Sheehy v. S. Pac. Transp. Co.</u>, 631 F. 2d 649 (9th Cir. 1980).[4]

---

[4]  These FELA cases are governed by the Supreme Court's opinion in <u>Eichel v. New York Cent. R. Co.,</u> 375 U.S. 253 (1963) (*"Eichel doctrine"*), which held that the trial court had properly excluded evidence of compensation benefits for the proffered purpose of impeachment.  While <u>Eichel</u> dealt specifically with benefits under the Railroad Retirement Act, this rule has been applied to other collateral sources, as well.  See, e.g.,

PLAINTIFF'S REPLY IN SUPPORT OF MOTIONS IN LIMINE                 9

Finally, and perhaps most importantly, the fact that the payer of damages and the dispenser of a collateral benefit are – unlike here – one and the same, or that they otherwise are linked in some economically meaningful sense, makes the deployment of the collateral source rule less attractive. See, for example, <u>Smith v. OPM</u>, 778 F. 2d 258, 263 (5th Cir. 1985) (suggesting that the collateral source rule may lack force "when the collateral source is the defendant"), *cert den.*, 476 U.S. 1105 (1986); <u>Olivas v. United States</u>, 506 F. 2d 1158, 1163-64 (9th Cir. 1974) and <u>EEOC v. Enterprise Ass'n Steamfitters Local No. 638</u>, 542 F. 2d 597, at 591 (2nd Cir. 1976) (similar holdings).[5]

## II. CONCLUSION

It is Caraway's position that the introduction of evidence collateral to the reasons given for his termination or traceable to collateral income sources, would be unduly prejudicial; thereby confuse and mislead the jury and, in the process, potentially provide the defendants with an undeserved windfall offset.

Without referencing Caraway's pension, or his wife's disability income,

---

<u>Raycraft v. Duluth, Missabe & Iron Range Ry.</u>, 472 F. 2d 27, 29 (8th Cir. 1973) (VA disability benefits).

[5] While the courts in the federal circuit generally are more inclined to exercise equitable discretion to take the receipt of collateral benefits into account in determining the extent of back pay (as opposed to front pay) awards, this distinction would appear to be of no moment where, as here, the collateral sources at issue have no economic connection to the defendants.

counsel would be free to question him, as it did during his deposition, about how long he may have intended to continue working until retirement. The jury can find, based on the evidence, whether or not it is likely Caraway would have continued working until age 62.

    For all of the foregoing, Plaintiff Caraway respectfully requests that the Court grant his exclusionary motions and for any other relief it may deem appropriate.

DATED: October 26, 2017           Respectfully Submitted,

                                                LAW OFFICE OF
                                                MICHAEL J. SAN SOUCI

                                   By:    /s/ Michael J. San Souci
                                                Michael J. San Souci
                                                Attorney for Plaintiff
                                                Paul Caraway

## CERTIFICATE OF COMPLIANCE

    I HEREBY CERTIFY that, pursuant to Local Rule 7.1(d)(2)(B), that the text of the foregoing reply brief, exclusive of captions and this certificate of compliance, does not exceed 3,250 words.

DATED: 10/26/17                     By:    /s/ Michael J. San Souci

///

///